May it please the court. My name is Brian Mass with my partner Jesse Bieber. We represent Henry Yuen on this appeal. As the court well knows, this is an appeal from an SEC enforcement action brought in the district court alleging that Dr. Yuen, while the CEO of a public company called Gemstar, knowingly misled the firm's auditors and thereby the public with respect to the financial statements of the company. On this appeal we've presented to the court, based on the record that was presented to the judge, we've demonstrated to the court that what the district court did was essentially what this court and others have admonished Finders of Fact not to do in fraud cases, which is to find fraud by hindsight. To look at a situation where a public company has filed accounting statements where revenue is recognized and the gap determination of the auditors is questioned and determined to have been wrong, and then to look backwards to find out who's to blame, whether somebody's responsible. And what happened here is that the district judge, picking and choosing from various places in the record, took those parts of the record that conveniently supported an inference that Dr. Yuen himself acted with fraudulent intent with respect to the financial statements. Well, let me ask you this. So you can see the record has information in it from which somebody could draw an inference of actionable intent? What we're showing, there's certainly, when you have financial statements that are inconsistent with gap, when you have situations where determinations are made that revenue is recognized that shouldn't have been, there is an inference that can be drawn that information was misrepresented or withheld. But what we've argued to the court, what the case law requires is that before you go to the facile conclusion that something like that must have happened, I've lost Judge Trott. Oh, wait a second, Ben. Just hold it.  Got excited now. Just when I was getting to the good stuff. I'm on. Can you hear me? Yes. Yes, we can. What I was pointing out was that while there is a facile inference that can be drawn from errors and gap from information that's presented, that somebody must have done something, what this Court's prior decisions, what the Supreme Court's decision in Telebs, although at a pleading level, tell the fact finder in a case like this is that you must consider and then balance the non-culpable inferences. Well, but why aren't, you know, what I'm hearing you say is there was a trial and that there are inferences that could go both ways. Why aren't you just asking us to reweigh the factual findings and the credibility findings and the factual determinations that were made by the district court? What we're saying is that there were certain factual findings that the district court relied on in drawing its inference of Sienta that were clearly erroneous. The factual findings with respect to what the auditors at KPMG knew about certain of these key transactions, the Motorola transaction, the Tribune transaction, the Fantasy Sports transaction, the district court got that wrong. She listened to the witnesses. She didn't go back to the contemporaneous documents which showed whether it be the work papers of KPMG or the Wells submission. We lost him again. So. We were just saying it's always worked well. This is probably like when a pilot's landing gear doesn't come down, someone's, you know, this is not what they, this is not what they, yeah. You're on again. Okay. What we're saying is that the district court failed in its obligation to step back into the circumstance where Jemstar and Dr. Ewan were at the beginning of this process, look at the events through the prism of the year 2000 moving forward, and fairly analyze the evidence and the inferences that could be drawn. Had she done so, she would have been faced with a company in 2000 where Dr. Ewan, the founder of the company and the creator of the interactive program guide and the advertising platform, believed fully in the legitimacy of it and the value of it. The outside world, whether it be the strategic partners like Thompson or other customers of Jemstar, its chairman of the board, Mr. Meyer from Thompson, and the auditors all believed that the product had value, where the first transactions that are at issue here took place at the time that Jemstar, which is a 300-employee company. I think we're going to need to get specific with certain transactions. Let me just pick one. You talked about Motorola, and as I understand, the real problem with Motorola is that Dr. Ewan signed a letter to the effect that Motorola requested that part of the settlement come in the form of the advertising revenue, and there's evidence in the record that says that it was Jemstar, not Motorola, that made that request, suggesting that what Dr. Ewan signed was incorrect and presumably knowingly incorrect, and that's the argument. Okay, there's evidence to that effect. That would seem to permit a court to make that conclusion as a finding of fact. What's wrong with it here? Well, there's two levels of problem with that. First is whether or not the finding that the representation was incorrect is consistent with the evidence where, although in the negotiations for the Motorola settlement, Jemstar was first suggested that part of the settlement be in the advertising. The amount of it and how it was going to work, how the advertising was going to work, was fully negotiated between Jemstar and Motorola. So the first question is whether or not the statement by Dr. Ewan that Motorola wanted the advertising could fairly be seen as being inaccurate. Secondly, and more importantly to the finding here, is whether or not the inference that he made that statement was consistent with the evidence. Whether or not the statement with the intent to mislead KPMG has any merit whatsoever. KPMG, which was responsible as the auditors for making the revenue recognition determinations, or making the gap determinations, knew that the advertising was part of the settlement, knew that there was $17.5 million set aside for the IPG advertising, knew the scope of the IPG advertising business that Jemstar was doing, and made the determination that under gap that revenue could be recognized. And so the question is whether or not the statement by Dr. Ewan that Motorola wanted the advertising could be seen as being inaccurate. And so the question is whether or not the statement by Dr. Ewan that Motorola wanted the advertising to be seen as being inaccurate. Well, it seems, though, that you have some overarching issues that kind of touch on everything in the sense that I think you do affect prior to fact. And I don't think whether it would be a jury or whether it would be a judge. On Scientific Atlanta, it seems that there was strong evidence presented that the, of no such agreement to off after the one expired that, you know, the representations that Dr. Ewan made, that there was strong evidence that there was no such agreement to continue on that. Then you also have, you have Dr. Ewan being very active in all of these transactions. I know that you argue that he didn't have knowledge of the fraud when he was, but he was behind the idea of splitting revenue reporting into three parts, repeatedly stated to the investors that the IP and the licensee would be the growth drivers, and then approve structured settlements to divert income into those revenue divisions. And I think that you also presented how, what his motive would be in terms of putting things in certain of these areas, because his bonus and, you know, how much money he makes depend on where these show up. So you've got all of those in the background, and I think that, you know, those of us in the business call that circumstantial evidence. And so why can't all of that somehow come into play when you're deciding who's telling the truth and who's telling the truth? And things, whether there's scienter, whether there was fraud, any of those things. Judge Kellerman, in your recitation, you sort of hit the, some of the very important elements here, because each of those instances factually happened. There's a financial statement with respect to Scientific Atlanta. Their IPG sector was going to be the growth sector. But that there in the case does not, cannot always provide the basis for an inference of scienter. And what I'd like to do is... Well, it can't always, but you have those facts there. And why can't a judge see it that way? This judge, in certain cases, a judge, when faced with a proper presentation of evidence, may be able to. This judge couldn't have. And the reason, if I may just address a couple of the factors that Your Honor just raised. Scientific Atlanta, the Scientific Atlanta transaction is a central instance in this case where the judge just got it wrong. And not because of a credibility finding, not because of making a one inference that's as reasonable as another. What happened in Scientific Atlanta is starting in March of 2000, going into 2002, the auditors from the company, knowing there was no contract, knowing there was no settlement, knowing that there was an act of litigation, not being presented with representations that there was a settlement in place, approved the recognition of revenues. And they approved it quarter after quarter after quarter, based primarily, and the record is undisputed about this. But now, is that how you're saying, does that then come to your argument of his good faith in relying on his accountants? The argument that we're presenting is not that Dr. Ewan has an absolute defense based on good faith reliance on accountants or professionals, which exists in certain cases where in a securities transaction, the principal goes to a professional to bless a particular transaction, and when it's gone wrong, the defendant says, but I went to my lawyer, I went to my accountant, they said it was okay, and the court says that only works if you've made full disclosure. Right. You've got a problem with that full disclosure. But here, this is not that case. This is a case where a company has an ongoing relationship with its auditors, and they're intimately involved in the company, and there's a back and forth between the auditors and the company over the information they need and want. What we're arguing is what the D.C. Circuit held in SEC v. Howard and other courts have said. Which is that a CEO of a company is entitled to rely on the auditor's recommendations. It's not an absolute defense. It's one factor to be weighed in the standard. You've still got the question of what it is the auditor is going on. If the auditor is being told by Dr. Ewan that Scientific Atlanta is willing to continue the agreement on the terms they had before, only it turns out instead of being willing to pay, I don't know if that's the case. But in evaluating whether the accounting treatment of Scientific Atlanta resulted from misrepresentations by anybody, particularly by Dr. Ewan, you have to look at the fact that they recognized revenues in the same situation, quarter after quarter, without any such representations, based on primarily the fact that the lawyers for Gemstar were touting the likelihood of winning the case. In March of 2002, Dr. Ewan gave a written representation that Settlement Talks, that Scientific Atlanta was willing to settle on those terms. Ironically, that's the quarter where the auditors in fact went public with the fact that they'd been recognizing revenues based on an expired license and the stock plummeted on that disclosure alone. To infer that Dr. Ewan knowingly made a misrepresentation, as opposed to having a good-faith belief that in fact Scientific Atlanta was willing to settle, is based on a complete misunderstanding, misinterpretation of the record and the importance of the prior quarters, and we've submitted in our brief a recitation from all the KPMG workpapers, showing Scientific Atlanta is the red herring of this case. The KPMG... We also present to the court arguments made by KPMG in their Wells submission, in which they very actively defended their treatment of the accounting decisions that were made on several of the key transactions here. And they don't say... Do they not say that they didn't have proper information when they were defending those positions? Not in the Wells submission, Judge Trott. Well, later on they did, though. All right, what's the matter with this? I'm looking at the judge's finding number 24 on page 63 of her opinion, 8063. It says... Now, with respect to what I just read, is that wrong? That is wrong, with respect to... It's wrong because the only representation that took place, whether it was knowingly false or not, we obviously say that the inference that it was knowingly false is incorrect, that took place in March of 2002, two years after KPMG began recognizing the revenue on the expired license of KPMG. And I want to point out, in the same way that they approved the recognition of revenue on the AOL Time Warner transaction, KPMG clearly believed that it was appropriate under GAAP to recognize revenues under these expired licenses because of the likelihood of success in litigation and the certainty of collection because of the size of the companies. Whether that was a proper GAAP determination is not, it can't be the basis of a fraud inference. It may have been wrong, but it was KPMG's determination, based in 2000 and 2001, on the disclosure of the information they did their own SAB 101 analysis and ended up... Let me interrupt you. Reading from 25. UN also ignored obvious warnings brought to his attention in the latter part of 2000 and early 2001 that showed that his 2001 guidance for IPG advertising revenues was unrealistic and not supported by the internal projections of Keener, as well as other Gemstar's advertising sales force executive. Was he so warned? Mr. Keener debated that... Whether he was warned, Keener believed that they would be, that a more conservative approach was proper. That this Court has held, on many occasions, that merely having aggressive sales targets, merely having received internal reports from underlings that the targets may be unrealistic, is not, cannot support the inference of fraud, whether it's at the pleading stage, whether it's at the pleading stage, whether it's in a PSLRA case, or in this case. Well, but that seems like, but when you keep talking about the PSLRA cases, those were at the pleading. This is after a trial. Which is a completely, I distinguish that. But certainly the standard after trial cannot be lower than the standard of pleading. If you want to have a strong inference of fraud to get past the pleading. Well, but it's different. It's not necessary, it's not, it's different because there are, there are, there are, there are, there are cases where the Court could have gone, the Court could have bought your argument, and then there would have been substantial evidence to support that, all the arguments you're making. The Court didn't buy your argument, and there's substantial evidence to support that. But when you have a case like this, where the overwhelming inferences, if the case, if Dr. Ewan's conduct is looked at fairly, based on the fact that the TV guide people are the ones who negotiated and dealt with KPMG on the key transactions, whether it be Motorola, Tribune, or Fantasy Sports. The idea that Dr. Ewan didn't come forward and volunteer to KPMG, given the facts of this, because that's the primary basis for the inference of fraud, is that he didn't come forward. I mean, there's a specific finding of fact that Ewan told KPMG at various times throughout the period between 2000 and early 2002, that despite the ongoing litigation, Scientific Atlanta was willing to extend the LSA as if it had not expired. Now, that's the basis for them, for the auditor, being willing to accept the revenue figures. Is that true or not? It wasn't, it wasn't true that it was the basis for the auditors making the revenue figures. But he made misrepresentations. You don't have to quarrel with that. They weren't misrepresentations. There were no misrepresentations made. There's no evidence even that the written representation was inaccurate, only that you're trying to find an inference of fraud, you work backwards from it, and you find that it was wrong. But in fact, there's no one, there's nothing in this record to suggest that Dr. Ewan didn't believe that Scientific Atlanta was planning to settle. As my time runs down, I want to mention, and I will hopefully have a minute or so for rebuttal, there is another key issue in the case, which is the disgorgement finding by the court. Regardless of liability, the court ordered that Dr. Ewan disgorge $7.5 million of the $59 million that he received in a certain transaction. I don't want to belabor what we pointed out in our brief. What you might want to say, did Dr. Ewan introduce evidence to rebut the SEC's valuation and disgorgement experts? I didn't see that. I saw that they put evidence on, which then arguably makes their prima facie case, but I didn't see any rebuttal of that. They did not put evidence on. Just as courts can engage in exercise in hindsight, if I were to engage in one, maybe I would have done it differently, but the reality is, the SEC had the burden of going forward on the issue of disgorgement. They relied solely on expert testimony to try to parse the events and put a number on it. Their expert testimony was... What's the problem with that, bringing in an expert economist in executive compensation? The problem is, if the economist is an expert in compensation, relies on a methodology to come up with a number that it's no good to use, it's really no more reliable than pulling a number out of the air. When you do an event study, which is a nice word, because in certain types of cases... But that's what rebuttal is for. How did you rebut it? It was rebutted by arguing to the judge that it was so unreliable that it shouldn't be accepted. And that's all a litigant has to do under Daubert, to preclude evidence under 702 of the federal standards. Well, but you could call your own expert that said that, you know, I mean, I didn't see any evidence. There might have been arguments, but I didn't see any evidence that you put on a rebuttal. With respect, Judge Kelley, maybe it would have been better, it would have been clearer, but the reality is that if the evidence on which a litigant, and the SEC is a litigant, like any other litigant, tries to rely, is, quote, scientific evidence that is, in fact, too unreliable. Just so I understand, your argument is, even though they did call this expert and they did put on evidence, that the evidence was insufficient to meet their burden of proof, so you didn't have to do anything? The evidence should not have been accepted by the district court, because as, quote, unquote, expert testimony, it failed the Daubert test of being sufficiently based in scientific methodology to be relied upon under any circumstances. It's not like we would have put in a witness that would have said, no, it's only $3 million, and he says $7 million. The point of the matter was that the expert for the SEC's entire methodology, from picking seven events, from not knowing the evidence, was not going to be able to do anything. Not in any way extracting what's called confounding information, which renders an event study completely inadmissible, to using a two-day window when there was no evidence of leakage. All this is pointed out in our brief. When that's done, the obligation of the district court was to throw up her hands and say, you know what, SEC, you can't convince me that a single penny of this transaction that Dr. Ewan did was excessive based on subsequent events, because you're a litigant. Your expert didn't use a methodology on which I can rely. And that's what she should have done. Counsel, I don't have your brief immediately in hand. Did you bring to us a specific Daubert issue on appeal? Yes, we did. I mean, our point, point two of our brief is the district court abused its discretion in relying on the SEC's expert, and we framed it exactly in the Daubert context. The district court should have rejected any of the expert presentation and was not able, therefore, to impose any discretion. You framed it in the Daubert context. Did you cite Daubert in your brief? Yes, we did. Page 55, 35 and then 55, both in the factual presentation and in the argument. Thank you. I see that I'm out of time. Well, we'll give you another couple of minutes to make up for our technical difficulties at the beginning. Thank you. Well, if you use it now, you're not going to get it later. Oh, I'm sorry. So you got your choice. I'll take it later. I thought you would. Good morning. May it please the Court, Karen Schimpf on behalf of the United States Securities and Exchange Commission. There are three points I would like to briefly address this morning. First, the district court's factual determinations are solidly supported by the evidence, as were her conclusions that Mr. Yuen intentionally committed securities fraud. Second, the district court's calculation of Mr. Yuen's ill-gotten gains from those violations was reasonable. Indeed, it was conservative, and it was well within the parameters of her discretion. And third, the district court was amply justified in assessing a severe penalty to deter Mr. Yuen and other corporate leaders who might be tempted to manipulate earnings in the future. This case stems from a massive accounting fraud that reached all the way to the topmost official in the company, Mr. Yuen, who the district court correctly found liable for multiple securities law violations, spanning a nearly two-year period that resulted in Gemstar restating over $230 million in revenues and shareholders losing billions of dollars in value. Is there any direct evidence of intent to defraud, or is it all circumstantial? There is direct evidence that he lied about the Scientific Atlanta and DirecTV, that there were agreements when he knew that there were not, and coupled with the fact that he was making repeated pronouncements to the market to watch these sectors, that certainly is persuasive evidence on those two. In addition, there's evidence that he misrepresented to the auditors whether transactions were stand-alone or not in, for example, e-books, and even stripped down. Did anyone from KPMG testify that Dr. Yuen affirmatively lied to them? Yes, especially with regard to Scientific Atlanta and DirecTV. They said if, in fact, the situation turns out to be what everybody else said it was, that there were no agreements. That Dr. Yuen had specifically said that there were. And, in fact, with Scientific Atlanta, Mr. Paulbaum specifically testified that he had asked Mr. Yuen, well, is it that they have agreed or just that you have discussed, and that Mr. Yuen said, no, they have said they agree that they will pay going forward. The only issue is these other patents. Mr. Yuen was involved in four general types of fraud at Gemstar. First, we've already been talking a little bit about his own false statements that there were oral agreements that existed, that Scientific Atlanta and DirecTV. And I will take just a moment to note that, contrary to what appeared was being argued a moment ago, KPMG's testimony and work papers clearly established that Mr. Yuen made oral misrepresentations. He only committed it to writing at the end, but he made oral misrepresentations about the status of the negotiations, which were critical to their analysis. And at trial, Mr. Paulbaum specifically testified he would not have approved the accounting had he known that, in fact, there was no agreement to pay as though the LSA had not expired. Second, there were quid pro quo arrangements, where Gemstar gave late in the negotiation dollar-for-dollar price reductions to their counterparts, and the LSA did not. Third, there were round trips, where Gemstar essentially funded its own revenue by giving its counterparty the cash with which to then buy advertising back from Gemstar, with Mr. Yuen's involvement and approval. That's the Fantasy Sports and both e-books transactions. And lastly, there was the blatant shift of print revenue to the IP sector at Mr. Yuen's direction, where Gemstar could not get the advertisers to pay any money for the ads that were being recorded as revenue on the IP sector. The district court specifically found that Mr. Yuen acted intentionally and not merely recklessly with respect to each of these eight frauds. The district court's lengthy discussion of the facts and well-reasoned conclusions were supported by ample objective evidence of Mr. Yuen's liability, as reflected in approximately six days of bench trial testimony by nine permissioned lay witnesses and thousands of pages of documentary evidence, much of which contains Mr. Yuen's own words memorialized in e-mails, management representation letters, and transcripts of analyst telephone calls. All of which Mr. Yuen attempted to rebut essentially through his own and Ms. Leung's testimony, both of whom the court explicitly found neither persuasive nor credible, even without taking into consideration Mr. Yuen's criminal obstruction of our investigation. The district court correctly rejected Mr. Yuen's defense that he relied in good faith on the auditors, in light of the ample evidence that he knew the case, and he did not ensure that they had full knowledge on any of the transactions. Turning to the second question, the district court did not abuse its discretion in calculating disgorgement. The effective enforcement of the federal securities laws requires that the commission be able to make violations unprofitable. The district court is thus given wide discretion to set a reasonable approximation of Mr. Yuen's ill-gotten gains. The judge here chose to rely on the most conservative, well-established method presented in the record, an event study, which Mr. Yuen conceded at trial. The court should look to the event study as the accepted method of calculating disgorgement. She used that study to determine how much loss Mr. Yuen avoided as a result of taking $59 million in what was effectively a share, a sale of 7 million shares before the entirety of the fraud had become known to the market. Mr. Yuen presented no evidence that the event study resulted in anything but a reasonable and indeed a conservative estimate of his gains. Instead, he has chosen to simply speculate about whether this or that could have been done differently, without presenting any evidence that the way it was done was in any way improper. Well, right now it seems that I was questioning counsel for Dr. Yuen on that, and I had initially sort of focused on the fact that I thought that there was a new thing presented, but that counsel said, well, what we're really saying is that it didn't meet the Daubert standard, so it shouldn't have been. It was wrongly admitted, and if it was wrongly admitted, then there's nothing there on that issue. They presented no evidence that it did not meet the Daubert standard. This, again, was a bench trial. The judge had wide discretion to decide whether to admit the testimony or not. She did admit it. Again, he conceded at trial. Was there a Daubert objection at the bench trial? No. He conceded at trial that an event study was the method that should be used to – was the accepted method of calculating disgorgement. Okay. Nor has he offered any other evidence about what his ill-gotten gains should have been. Okay. So let me interrupt you for one second, because I know the other side's going to stand up and scream bloody murder. We didn't concede that at all. On what basis do you make the statement that they conceded at trial that the event study was the appropriate way to do this? Yes. If you look in the record, it's volume 30, page 8077. If I recall correctly, that was part of their proposed findings. Volume 30 what? Volume 30, page 8077. The quote is, the Court should look to the event study as the generally accepted method of calculating disgorgement. That's a direct quote from their proposed findings. Thank you. Nor has Mr. Yuen offered any other evidence to what his disgorgement should have been. He wants to simply throw up his hands, say it can't be done, and sink a boat into the water, and end up on the underwater side of the ocean, and be no different than Stan Ankomis or the anonymous των, Bill Williams. That would turn the disgorgement test on its head. As the wrongdoer, the law is clear that it is Mr. Yuen who bears any risk of uncertainty, not the investors who harmed. But that being said --" of her discretion. She could have justifiably determined a much higher amount of disgorgement on the record before her. Her conclusion thus comfortably falls within a broad range of permissible conclusions that this Court should not disturb. Finally, Mr. Yuen argues that the District Court treated him unfairly by assessing --" Wait, before you move on from that, you said that it was comfortable, it was well within. Were there any allegations or disgorgement requests that the District Court should have made? We had requested a much higher amount. We had requested, I believe it was in the neighborhood of $10 million for the loss avoidance alone, which was based on the implied value study. That resulted in a higher upside potential. The judge chose to go with the more conservative and well-established event study. So the District Court didn't buy your argument in its entirety? I mean, basically, it found that the number wasn't that high. It wasn't the number you were asking for. She did not go with the number we had requested. She did not say that she found any fault with the implied value study. She simply said she was going with the $7.5 million, which was the result of the event study. Is the difference between the two based on how rapidly the information is absorbed by the market? I don't think so. I didn't look at the implied value study you mentioned, so I was trying to figure out between the gross difference between the price, kind of the beginning and the price at the end of the story, the disgorgement figure was clearly slower, was less than that, and there was discussion of, I guess, the two-day window for the event study. What was the two-day window? The two-day window is in the event study, not the implied value study. And Mr. Yuen has argued that the two-day window is in the event study, that a two-day window was inappropriate because on one occasion, the majority of the loss that was assessed against him occurred the day before, in the hours before the announcement had been made public. However, the expert testified without contradiction that an event study uses a two-day window commonly, and specifically looks to the day before, and in some cases even many days before, to assess the loss. Mr. Yuen has not pointed to any evidence that there wasn't leakage. In fact, on that one that he points to, there's strong circumstantial indicia that there was leakage, because there was an otherwise unexplained significant drop in the price on nearly triple the normal volume of shares in trading. And again, there was no evidence that that was in any way improper. The only evidence in the record was that that was an accepted means of doing the study. The district court acted well within its discretion in setting the penalty. A penalty equal to disgorgement is expressly authorized when the violation involved fraud, deceit, or manipulation, and directly or indirectly resulted in substantial losses to other persons. Here, the head of a major respected corporation intentionally and repeatedly committed securities fraud. The accounting frauds he participated in struck at some of the most fundamental principles of what financial accounting is about, and caused the shareholders to lose billions of dollars. I know there was an obstruction of justice charge, but contained in the record is what Dr. Yuen did with his computer and all of that. How was that argued in front of the district court? How does that play into? There were plea negotiations ongoing at the same time. Was it evidence before her that that was behavior, and was it somehow related to the fraud, deceit, anything along those lines? Was it argued, or how did that? It was not specifically argued. She knew about it. I'm not sure exactly how it was presented to her. She was certainly aware of it. And she specifically said in her ruling that she found his trial testimony incredible, even without looking at the fact that he had obstructed justice. So she even gave him the benefit of the doubt there, took that out of the equation in her findings. Thank you. So for the penalty assessed was amply justified, and for all the foregoing reasons, as well as detailed more specifically in our brief, we will leave that to the district court in full. Thank you. Roboto? If I may briefly return to the discouragement issue, and it's laid out in our brief, I just want to point to a couple of factors. The SEC's expert testified that a proper event study to be reliable must take into account this discouragement of the defendant's testimony. He said there was a type of information that he called confounding information, that would be information in the marketplace that was unrelated to the events in the company. It should be remembered, the stock dropped over the period in question much more than the $1.21 that the expert said, or the purported expert says, was attributable to the announcements by the company. He said that confounding information has to be taken into account. He also said that he considered the implied value study as his quote-unquote corroboration of his event study. He conceded that the implied value study, which came up with a number slightly higher in terms of the dollar amount, was a type of study that he'd never applied in this type of a case, that he knew of no other instance where it had been applied, and he could not point the court or the questioners to any instance where it had been peer reviewed or accepted. So that's a disqualifying approach, which Judge Felser recognized when she rejected the SEC's request for a higher number of discouragement, but that's supposedly the corroboration of those supposed lesser number, because their expert himself conceded that without corroboration, his failure to take out the confounding information was disqualifying. So if it's disqualifying, you can't reinforce one instance. He admitted that rather than try to determine for each event what part of a drop was due to confounding information and what wasn't, he had seven instances. His testimony specifically was, what you do is you hope that the effect of the confounding information over seven instances will even out. Sometimes it will go up, sometimes it will go down. But regardless, what you have to do, what I did, he said, was I went to a second methodology in order to corroborate the first, because the first you can't be so sure of standing alone. So we went to this implied value methodology, which he said corroborated it, but in fact, as we point out in our brief, the implied value methodology itself is completely suspect. It has no scientific basis. It could not have been the basis for the expert presentation in the first instance, and therefore can't be the corroborative element for the event. Well, I now have your memorandum attacking the disgorgement order, and you do say that the event study is the generally accepted method of calculating disgorgement. It is. And in mergers and acquisitions, in shareholders' disputes, properly done event studies, which includes factoring out confounding information, which includes setting an appropriate window, we're not saying all event studies are bad. We're saying that this event study in this case, which didn't factor out confounding information, used, we point out one of the events where there's a 44% of the $1.21 attributed to an August 14th announcement. The entire drop is the day before the announcement, and there is no evidence of leakage. And in fact, he said that this whole approach for a multi-day window is because in the mergers and acquisitions context, there's often leakage. Judge Felser himself said that. At the trial, pointed out that this isn't a mergers and acquisitions case. Why didn't you bring in an expert to support all of this stuff instead of quibbling with the figures? You say based on these two errors alone, Dr. Smith's $1.21 per share decline could be reduced to 35 cents a share. Could be? This is, well, first of all, this is, as Bob said, this is probably the place where I point out that I didn't try the case. But more importantly, in that footnote... Whenever something is wrong, the lawyer didn't try the case. But what you're looking at, Judge Trott, is in essence a fallback position that we have, which is that at a minimum, that 44 cents on August 14th, which is a third of the disgorgement, and therefore a third of, about a quarter of the penalty, is completely unreliable because of the use of the two-day window. So at a minimum... It would have been nice if the lawyer who tried the case would have brought in somebody to testify to this rather than just make an argument that something could be. But Daubert doesn't, under Daubert, you're not required to. The proponent of the information has the burden. In this instance, the SEC failed in its burden because it relied on an unreliable methodology. I don't see Mr. Arkin saying anything about Daubert either. In his proposed findings, they clearly present to the judge as what should be her proposed findings, a rejection of the event study as it was done, which, whether or not Daubert is actually cited, is a clear indication that their proposed findings of fact and conclusions of law intended the district judge to reject the event study as it was presented. With respect to the... Your time has expired.
judges: Trott, Clifton, Callahan